THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) ) ) | Case No. 2:17 CR 485 DS |
| Plaintiff, | ) |  |
| vs. | ) | MEMORANDUM DECISION |
| TOMMY GURULE | ) ) ) |  |
| Defendant. | ) |  |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

This matter is before the court on defendant Tommy Gurule's motion to suppress. Defendant Tommy Gurule (hereinafter "Mr. Gurule") has moved to suppress all evidence obtained as a result of the detention and search of his person during a traffic stop on 29 June 2017. Mr. Gurule asserts that all evidence obtained and all statements made to law enforcement officers after the search are poisonous fruits of a detention and search made in violation of his rights under the Fourth Amendment of the United States Constitution and must therefore be suppressed. The court bases its decision on parties' arguments from an evidentiary hearing held 11 December 2017 and subsequent briefings.[1]

---

[1] The record also contains footage from the body cameras of both investigating officers. *See* Exhibit1/A.

## STATEMENT OF FACTS

The court finds the following facts. Mr. Gurule was the backseat passenger of a car stopped for a traffic violation by West Valley City Detective Jeffrey Smith (hereinafter "Detective Smith") when the driver of the car engaged in improper lane changes and failure to use a turn signal. ECF No.19 at 2. As Detective Smith turned on his lights, the vehicle pulled into a gas station. *Id*. Detective Smith pulled up behind the stopped vehicle, approached the passenger side window, and requested identification from all three occupants of the vehicle. *Id*. at 2-3. Upon returning to his vehicle to check the record of each occupant, Detective Smith called for back-up. *Id*. at 3. Detective Benjamin Watson (hereinafter "Detective Watson") soon arrived on the scene. *Id.* Upon looking into the vehicle, Detective Watson could see a considerable amount of property piled almost to the ceiling next to the back seat passenger. *Id*. The property caught his attention because it would be hard to see any weapons hidden near the passenger. *Id*. at 3-4. However, Detective Watson acknowledged that Mr. Gurule made no furtive movements while in the car. ECF No. 16 at 53:15-16. Detective Smith also acknowledged that none of Mr. Gurule's actions while in the car made him think Mr. Gurule was dangerous in any way. *Id*. at 25:16-18.

The record check revealed that none of the occupants of the vehicle had a valid driver's license and that the driver of the vehicle had some misdemeanor warrants for her arrest. ECF No. 16 at 11:8-15, 12:5-8. Detective Smith asked the driver to exit the vehicle, which she did. *Id*. at 12:10-12. After a brief conversation in which Detective Smith asked her, among other things, whether there was anything illegal in the car, the driver consented to a search of the vehicle. *Id*. at 12:14-16. Because the officers planned to search the vehicle, Detective Smith asked Mr. Gurule to exit the vehicle and Detective Watson simultaneously asked the front passenger to exit the vehicle. *Id*. at 12:23-25, 13:1. Detective Watson conducted a consensual pat down of the

front seat passenger while Detective Smith was engaging Mr. Gurule in conversation. *Id*. at 41:7-9.

As Mr. Gurule exited the vehicle, Detective Smith asked whether he had anything illegal on him. ECF No. 16 at 13:21-22. Mr. Gurule said he did not. *Id.* Detective Smith asked whether he could search Mr. Gurule for weapons; Mr. Gurule responded that he did not want to be searched. *Id*. at 13:22-25. Detective Smith then told Mr. Gurule to sit on the curb near the vehicle, *Id*. at 14:1, which Mr. Gurule did, with his arms "completely slouched forward on his knees." *Id. at 42:14-15.* Detective Watson testified that the way Mr. Gurule leaned forward while sitting on the curb gave him concern that he might be preparing to flee or fight, but acknowledged that Mr. Gurule did not reach for anything or attempt to flee. *Id*. at 54:22-25, 55:1-11.

Detective Smith asked Mr. Gurule whether he had any weapons on him. ECF No. 16 at 15:2. Mr. Gurule looked away and said, "no." *Id*. at 15:8-10. Detective Smith then asked specifically whether Mr. Gurule had a gun on him. *Id*. at 15:20-21. Mr. Gurule, broke eye contact with the detective, looked away when he said "no," and then looked back at the detective. *Id*. at 15:19-23. Detective Smith told Mr. Gurule he felt like Mr. Gurule was "giving [him] dodging answers" and asked him to stand up. *Id*. at 16:11-12. Though Detective Smith expressed concern that Mr. Gurule answered his questions in an evasive manner, he acknowledged that Mr. Gurule did not show any signs of dangerousness in the car, did not make any furtive movements or gestures, nor indicate any signs of dangerousness after leaving the car. *Id*. at 25:11-18, 26:17-25, 27:1-2.

Detective Watson testified that while Mr. Gurule was sitting on the curb, Detective Watson saw "a large bulge on his right pocket of his jeans. It appeared that there was some sort of large item in his pocket." ECF No. 16 at 43:9-21. With Detective Smith standing on one side of him and Detective Watson on the other, Mr. Gurule was asked to stand up. *Id.* at 44:12-16. As Mr. Gurule began to stand, Detective Smith held Mr. Gurule's left wrist and back of his arm to support him. *Id.* at 16:13-21. Detective Watson testified that as Mr. Gurule was standing, he noticed Mr. Gurule brought his right hand near the pocket where Detective Watson had seen the bulge, so the detective grasped Mr. Gurule's forearm to make sure Mr. Gurule did not reach for whatever was in the pocket. *Id.* at 44:16-20. Detective Watson testified that "as soon as [he] grasped his arm or put [his] hand around his forearm area [he] saw a handle or a grip to a small handgun in that pocket where that bulge was." *Id.* at 45: 5-7. Detective Smith testified that "when [Mr. Gurule] stood up [he] saw a silver colored object in [Mr. Gurule's] pocket," and he heard Detective Watson say he saw a gun in Mr. Gurule's right front pocket, after which he "held onto [Mr. Gurule's] arm a little bit more firmly," handcuffed him and retrieved the gun from his pocket. *Id.* at 16:25-17:2-13. When asked how much time passed between the time he asked Mr. Gurule to exit the vehicle and when he located the gun on Mr. Gurule, Detective Smith responded, "I don't know. 15, 20 seconds, 30 seconds. I am not sure". *Id.* at 17:17-18.

Mr. Gurule was interviewed a short time later in Detective' Smith's patrol car, where he was given *Miranda* warnings and agreed to speak with Detective Smith about the incident. ECF No. 16 at 18:20-25, 19:1-3. Mr. Gurule acknowledged that he was in possession of the gun and had had it for years. ECF No. 18 at 4. He also explained where he obtained it. *Id.*

## DISCUSSION

Mr. Gurule has brought a motion to suppress the evidence obtained from the illegal detention and search of his person. The government's burden in responding to a motion to suppress is to establish, by a preponderance of the evidence, the legality of the seizure and search. *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012). The government thus need only show that there is a 51% likelihood that the Fourth Amendment was not violated. *United States v. Banks*, 93 F. Supp. 3d 1237, 1251 (D. Kan. 2015). The court finds that this burden was not met, and Defendant's motion to suppress is granted.

### Reasonableness of Detention

A traffic stop is a form of seizure under the Fourth Amendment. However, the Supreme Court has also held that an officer making such a traffic stop may order passengers to get out of the car pending completion of the stop, even without any belief that the passenger(s) have committed a crime. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). But in order for an investigative detention to be reasonable, an officer's actions must be justifiable at the beginning and then remain "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995), citing *Terry v. Ohio*, 392 U.S.1, 20 (1968). The court finds that, although the initial stop based on traffic violations was reasonable, the further seizure of Mr. Gurule and subsequent search of his person were not.

The Supreme Court stated in *Rodriguez v. United States* that once "the tasks are completed as it relates to a traffic stop, the defendant is free to go." ECF 18 at 6; *see also* 135 S. Ct. 1609 (S.Ct. 2015). After having collected his license and verified that Mr. Gurule was not

wanted (the necessary tasks related to the original stop, at least in regards to Mr. Gurule), he should have been free to leave. However, the police asked for permission to conduct a search of his person and, when he expressed his wish not to be patted down, ordered him to sit on the curb. ECF No. 16 at 13-14.

Officers unarguably have the right to protect themselves and to secure the area where they are working. *See Terry*, 392 U.S. at 23; *see also United States v. McHugh*, 639 F.3d 1259, 1261 (10th Cir. 2011) (O'Brien, J. concurring). In this situation, however, the officers were in a large parking lot clearly open to the public and there were other options available for the officers to protect themselves (i.e. the passengers could have been told to leave or stand farther away, etc.). *See* ECF No.19 at 2. Instead, their identifying documents were not returned to them and they were instructed to sit on the curb adjacent to the car. *See* Exhibit 1/A at 9:47-9:52; *see also* ECF No. 16 at 14. At this point, the officers also continued to ask questions of Mr. Gurule and then had him stand, grabbed his arms, and performed a nonconsensual pat down – all of which served to make it clear to Mr. Gurule that he was not in fact free to leave. *Id*. at 14-16. And if a reasonable person does not feel "free to leave," then they have been "seized" by the police. *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

Such an additional seizure following the original stop would only be constitutional if the officers in question had an objective and reasonable suspicion of criminal activity. *Florida. v. Royer*, 460 U.S. 491, 498 (1983) (plurality); *United States v. Fox*, 600 F.3d 1253, 1257 (10th Cri. 2010); *see also United States v. Alarcon-Gonzalez*, 73 F.3d 289, 293 (10th Cir. 1996). This is ascertained in light of the "totality of the circumstances." *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997). Nor can the "combination of wholly innocent factors…combine into a

suspicious conglomeration unless there are concrete reasons for such an interpretation." *Id*. at 948.

In the course of the stop and the ensuing interaction, Mr. Gurule engaged in polite conversation with the officers, followed their orders, and (despite stating that he did mind a pat down) responded to all of their questions. ECF No. 16 at 13-16. To put his actions in context, the Supreme Court has stated that a defendant's "refusal to listen or answer does not, without more, furnish [the] grounds" necessary for reasonable or objective suspicion. Therefore, the court finds that Mr. Gurule's much more cooperative actions do not even reach that bar. *Royer*, 460 U.S. at 498 (plurality). Nor is Mr. Gurule's criminal history relevant, as the Supreme Court has also stated that "prior criminal involvement alone is insufficient to give rise to the necessary reasonable suspicion." *Wood*, 106 F.3d at 948.

This court thus finds that, viewing the evidence in its entirety and considering the totality of the circumstances as related to the court during the hearing and contained in the bodycam footage, there was insufficient evidence to find reasonable suspicion of criminal activity. This court additionally finds that everything after Mr. Gurule's exit from the vehicle amounts to an illegal detention.

**Legality of the Search**

Even if ordering Mr. Gurule to sit on the curb was not a violation of his Fourth Amendment rights, the court finds that the nonconsensual "pat down" of his person clearly was. In order for a nonconsensual "pat down" to be constitutionally sound, an officer must first "[observe] unusual conduct which leads him reasonably to conclude in light of his experience that [1] criminal activity may be afoot and that the persons with whom he is dealing may be [2]

7

armed and [3] presently dangerous." *Terry*, 392 U.S. at 30 (numbering added). Mere "[i]nchoate suspicions and unparticularized hunches, however, do not provide reasonable suspicion." *Wood*, 106 F.3d at 946; *Alarcon-Gonzalez*, 73 F.3d at 293; *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989). Rather, the officer in question's suspicions of whether criminal activity is underfoot and whether the defendant is armed and dangerous must be "objectively reasonable." *Wood*, 106 F.3d at 946.

As stated above, there was no evidence from which the court can find objective suspicion of criminal activity. Nor was there objective suspicion that Mr. Gurule was "presently dangerous." *Terry*, 392 U.S. at 30. In *United States v. House*, a citizen's report to police officers that the defendant had a gun was not sufficient to suggest that he was dangerous, only that he was armed. 463 Fed.Appx. 783, 788 (10th Cir. 1999) (unpublished opinion). In Mr. Gurule's case, the officer's statement regarding the siting of a bulge in his pocket is also insufficient to create a suspicion of danger. ECF No. 16 at 43; *Id*. at 788. This is again similar to the facts in *House* where the defendant's denial that he was carrying a weapon was found neither reasonably suspicious nor indicative of criminal activity. Even though the officers could observe a knife clipped to his pants, the court found it was not reasonably sufficient to make him "presently dangerous." *Id*. at 788-89.

The government argues that Mr. Gurule's nervous body language and irregular eye contact made the officers wary. ECF No. 16 at 26. But a defendant's nervousness is not a deciding factor. *Id*. In fact, the 10th Circuit has recognized that this is not uncommon in an exchange with an officer, and "has repeatedly held that nervousness is of limited significance in determining reasonable suspicion" and should "be treated with caution." *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994).

Accordingly, the court finds that despite the alleged "dodgy" actions of Mr. Gurule, including his forward-leaning posture and inconsistent eye contact, the facts of Mr. Gurule's situation are similar to the situation in *House* and are not objectively sufficient to create the necessary reasonable suspicion of criminal behavior sufficient to justify his continued seizure and subsequent search. The court concludes that the government has not met its burden to demonstrate that there was no Fourth Amendment violation by a preponderance of the evidence.

Given these findings, the court holds that evidence of the gun found in Mr. Gurule's pocket is suppressed.

## Suppression of Confession

Because the court here finds that both the seizure and search of Mr. Gurule were unwarranted, his later statements to the police are indeed "fruit of the poisonous" tree and should thus be suppressed as well. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

Based upon these findings, the evidence presented in the December 11, 2017 hearing, and the parties' briefs, the court grants Defendant's motion to suppress.

SO ORDERED.

Dated this 14th day of February, 2018.

BY THE COURT:

*[signature: David Sam]*

DAVID SAM
SENIOR JUDGE
UNITED STATES DISTRICT COURT